THE ROBERT DOLLAR.

THE TIGER.

(Circuit Court of Appeals, Ninth Circuit. December 2, 1907.)

No. 1,413.

COLLISION—STEAM VESSELS CROSSING—CONTRIBUTORY FAULT.

A steamship navigating San Francisco Bay on a bright moonlight night after exchanging crossing signals of one whistle with a tug with a tow approaching her course ahead from her port side, being the privileged vessel under article 19 of the Inland Navigation Rules, Act June 7, 1897, c. 4, § 1, 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883), was required by article 21 to keep her course and speed, and where she continued porting her helm, and although her master was watching the tug and knew that it did not port in compliance with the signal, and was uncertain as to its intended course, failed to slow down and signal such fact as required by

rule 3 of the pilot rules, she is chargeable with contributory fault for a collision with the tow, although the initial fault was that of the tug.

Appeal from the District Court of the United States for the Northern District of California.

Page, McCutchen & Knight, for appellants.

F. R. Wall and Walter H. Robinson, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge. We think this a plain case. The collision which was the subject of the action occurred between the steamer Robert Dollar and a laden barge at the time in tow of the tug Tiger, on the Bay of San Francisco, between 12 and 1 o'clock of a perfectly bright night—the moon being nearly full. There was a strong ebb tide flowing at the time. The tug was confessedly at fault in more than one particular—first, in not having a lookout; second, in not having any light on the barge; third, in not porting her helm and going to starboard in accordance with the single blast that she gave. The real question in the case is whether the Robert Dollar was also at fault as was held by the court below.

It appears that the steamer left her berth on the northerly side of Steuart Street Wharf at 12:45 a. m. with a cargo for a northern port, and, after turning, headed out into the bay with helm amidships, and moving under a slow bell. About the same time that the Robert Dollar started, the steamer Harold Dollar left her berth on the southerly side of the same wharf, and proceeded out into the bay on the starboard side of the Robert Dollar. The captain of the latter was on the open bridge of that vessel, with the first officer and two men on the forecastle head. "The first officer," said the captain in his testimony, "had instructions from me to keep a good lookout. The two men were up there with him ready to lower the yard down when we got clear of the docks, as we do, but not before we get clear of the docks." The men started to lower the yard under the instruction of the first officer after the steamer had cleared Harrison Street Wharf and before the collision. When the Robert Dollar had cleared the Steuart Street Wharf and was about opposite Harrison Street Wharf, her captain saw two bright lights, one above the other, about half a mile distant and about four points off the Robert Dollar's port bow. He knew that they were the lights of a tug, and with his night glasses "looked plainly to see in what position they were." On leaving the dock he had given the customary "one long whistle" to indicate that his steamer was going out, and when about 1,000 yards from the wharf he heard one whistle from the tug Tiger and answered with one. The testimony of the captain of the Robert Dollar is to the effect that at the time the Tiger gave the one whistle she was from 1,000 to 2,000 yards from his steamer, and the testimony of the captain of the Harold Dollar is that the two vessels in question were then about a third of a mile apart. It is certain that they were a long distance apart, and as the night was so bright and clear, according to the testimony of the captain of the Robert Dollar himself, that he could see all over the bay, and as he further testified that with his night glasses

he steadily watched the movements of the tug and saw that her course was not changed, surely good seamanship on his part should have prevented the collision, notwithstanding the clear and conceded' faults on the part of the tug. Since the latter had the Robert Dollar on its starboard side, the rule of the road imposed upon the tug the duty of keeping out of the way of the steamer, and upon the latter the duty of keeping her course and speed. Articles 19 and 21 of Act June 7, 1897, c. 4, 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883); Rule 2 of Supervising Inspectors. That the Robert Dollar did not keep her course is distinctly and repeatedly stated in the testimony of her captain. The fact that he continually ported the helm of the steamer and threw her further to the starboard, from the time the tug gave her one whistle until the danger of collision became immediate and imminent, thinking that in view of the condition of the tide such action would be more apt to avoid the tug, does not change the fact that he violated the rule of the road which required him to keep his course. And since the case shows that the collision barely occurred at it was, it seems highly probable that but for the deviation of the course of the steamer by her captain the collision would not have occurred, notwithstanding the gross faults of the tug. Moreover, it clearly appears from the testimony of the captain of the Robert Dollar that the two vessels were gradually coming together and that notwithstanding the tug had signaled that she would port her helm so as to cross the stern of the steamer, it had not in fact changed its course, for he still saw the two perpendicular lights, and could not see either the red or green light of the tug. During all of this time the captain of the steamer, according to his own testimony, was uncertain as to the course the tug would take. He said: "I expected him (the captain of the tug) to turn at any moment. I knew he was not turning. I was watching him closely with my glass, I could see the barge but not the tug. I could see they were coming close together." Notwithstanding this, the captain of the steamer gave no indication by whistle or otherwise of his uncertainty as to the course or intention of the tug, but continued to deviate from his own course, in further violation of rule 3 of the pilot rules, which provides, among other things, as follows:

"If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered and understood, or until the vessels shall have passed each other."

It is unnecessary to decide or consider whether there was still other and further fault upon the part of the steamer, as is contended on behalf of the libelant and intervener, as, for the reasons above stated, we are of opinion that the court below was clearly right in finding both vessels in fault.

Accordingly, the judgment is affirmed.

Since the foregoing opinion was prepared, the proctors for the appellant have called our attention to the recent case of Owners of the

Albano v. Allan Line Steamship Company, Ltd., decided by the Privy Council of England. on appeal from the Supreme Court of Canada (Maritime Law Cases, New Series, October, 1907, 365), in which case it appeared that two steamships—the Parisian and the Albano—were approaching each other on courses which converged almost at right angles at the point where the collision took place, which point was about the place where each of the vessels expected to pick up a pilot.

The case made on behalf of the owners of the Parisian, as stated by the court, was as follows: The Parisian was a screw steamship of 3,385 tons net register, and 440 ft. in length, belonging to the Allan Line Steamship Company, Limited, and, whilst bound from Liverpool with passengers and general cargo, was proceeding towards Halifax Harbor on the afternoon of the 25th March, 1905, to pick up a pilot and proceed under his charge into Halifax. The weather was fine and clear, the sea calm, the wind southerly and very light, and there was no perceptible tide. Shortly before 4:40 p. m. the Parisian was steering N. W. ¾ N. magnetic, and, with engines working at full speed, was making about 14 knots. She was coming in along the western shore in the ordinary and usual way to the pilot station, and was flying flags for a pilot. A good lookout was being kept on board of her. At about 4:40 p. m. those on board of her saw the pilot cutter at the pilot station, just outside the entrance to the harbor. The engines were accordingly rung "stand by" at 4:52, at 4:57 they were reduced at half speed, and 4:58 they were slowed, and at 4:59 they were stopped and remained stopped until 5:6, and the helm was ported a little to bring the Parisian's head more on to the pilot cutter. After the engines were stopped the Parisian quickly lost headway, and a row boat accordingly left the cutter with a pilot on board for the Parisian, and was rowed to her. The Parisian was then lying practically stopped in the water with her head about N. by W. magnetic. When the row boat came along the starboard side of the Parisian a rope was thrown to her, and the pilot, at about 5:6 was just about to step onto the ladder, which had been put over side for him, to come on board. Whilst the Parisian was thus engaged the steamship Albano, after mistaking her course for Halifax Harbor and running too far to the eastward on a north by easterly course, had turned around and was approaching the harbor on a westerly and southerly course. Those on board the Parisian first saw the smoke from the funnel of Albano close to the northeast land, and at 4:45 made out her hull about 5¾ miles distant and more to the westward. The Albano afterwards approached on the starboard side of the Parisian with the Parisian and the pilot cutter and the row boat in full view. At about 5:6 p. m., after sounding three short blasts on her whistle, she came on at a high rate of speed, heading for the starboard side of the Parisian about amidships, and making a collision unavoidable. The Parisian, to avoid being struck in the engine room, promptly put her engines full speed ahead, and about half a minute later was struck by the stem of the Albano a very heavy blow on the starboard side aft. The vessels met at about a right angle, and the Parisian was cut into so deeply that to avoid sinking in deep water she had to run into Halifax Harbor, where she immediately sank.

The case made on behalf of the owners of the Albano was that the Albano, a screw steamship of 2,423 tons net register, whilst on a voyage from Hamburg to Halifax, was, about 20 minutes before the collision, standing across from the eastward on a course of W. S. W. ¾ W. magnetic, towards the pilot station at the entrance to Halifax Harbor, and with engines working at full speed was making about 9 knots. The weather was fine and clear, the wind a moderate southerly breeze, and the tide was flood setting towards the harbor at less than half a knot per hour. In these circumstances those on board the Albano saw the Parisian coming up from the south seven or eight miles distant, and about six points on the port bow. The course was afterwards altered to W. ¼ S. for the pilot cutter, and as the Albano approached it the engines were rung "stand by" and afterwards reduced to half speed and slow. When the Albano was distant about five lengths from the Parisian immediate danger of collision first appeared to those on board the Albano, and she at once stopped and reversed her engines full speed, and at the same instant sounded three short blasts of her whistle. The rudder was kept amidships and she kept her course with diminishing momentum. The engines worked full speed astern for two minutes before and up to the time of collision, and the Albano at the time of the collision was almost dead in the water, and the starboard side of the Parisian came in contact with the stem of the Albano.

The regulations in force in the waters where the collision took place, so far as applicable to the case, were as follows:

"Art. 19. When two steam vessels are crossing so as to involve risk of collision the vessel which has the other on her own starboard side shall keep out of the way of the other."

"Art. 21. Whereby any of these rules one of two vessels is to keep out of the way the other shall keep her course and speed.

"Note.—When in consequence of thick weather or other causes such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed, or stop or reverse."

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

The judgment of their Lordships was that although the Parisian arrived at the point of collision first, and was there almost without motion, the consideration of the situation should be carried back to the time when the two vessels were approaching the spot where the collision took place and the controlling fact considered that "they were, in fact, converging on a spot on courses and at speeds which would probably bring them to that spot so as to present a danger of collision when they reached it, which each of them would do in the course of her navigation," in which circumstances the vessels were vessels crossing so as to involve risk of collision, and that articles 19, 22, and 23 were applicable. It was therefore held that it was the duty of the

Parisian to have kept out of the way of the Albano. But the court also held that the Albano was also bound to comply with article 21, "and to keep her course and speed until she found herself so close to the Parisian that the collision could not be avoided by the action of the latter vessel alone." Upon the facts of the case, however, the Albano was held without blame, the court saying, among other things:

"It must always be a matter of some difficulty for the master of a vessel which has to keep her course and speed with regard to another vessel which has to keep out of her way to determine when the time has arrived for him to take action, for if he act too soon he may disconcert any action which the other vessel may be about to take to avoid his vessel, and might be blamed for so doing, and yet the time may come at which he must take action. Therefore he must keep his course and speed up to some point and then act, but the precise point must necessarily be difficult to determine, and some little latitude has to be allowed to the master in determining this."

In conclusion, the court observed:

"That the regulations are the outcome of experience and of conferences held by representatives of the maritime nations, and if firmly acted on and applied are more likely to obviate the doubts and difficulties by which those navigating vessels may be assailed—for instance, in cases similar to the present case, which may not infrequently arise where vessels are making for the entrance of a port at the same time—than if the actions of those in charge are to be guided by rough estimates of courses and speeds to determine which vessel is slightly ahead of the other, and considered afterwards by the light of conflicting evidence as to whether these estimates were right or wrong."

We think the decision of their Lordships in the case cited in line with our conclusion in the present case that both the tug Tiger and the steamer Robert Dollar were in fault in the particulars hereinbefore indicated.

The judgment is affirmed.

NOTE.—The following is the opinion of De Haven, District Judge:

DE HAVEN, District Judge. The collision between a barge in tow of the tug Tiger and the steamer Robert Dollar, which is the subject of this action, occurred about one o'clock on the morning of July 13, 1905, in the Bay of San Francisco. The night was clear. In view of this fact, it is evident the collision would not have been possible without the fault of one or both of the vessels, and upon consideration of all of the evidence my conclusion is that both were in fault. The Tiger is in fault in having no lookout, and in not going to starboard as indicated by her signal of one whistle, given at the time she was first observed by the Robert Dollar, and while it is true the Tiger was the obligated vessel, having the Robert Dollar on her starboard side, still the Robert Dollar was in fault in continuing to go ahead after her master saw that there was no change of course on the part of the Tiger, and after it ought to have been apparent to him that the strong ebb tide was carrying his vessel so far out of her course that a collision was likely to occur, unless her engines were stopped and reversed; but the order to stop the engines of the Robert Dollar was not given until the collision was inevitable. As both vessels were in fault, the libelant and intervener are entitled to recover against both; the damages to be equally apportioned between them, and any balance of such moiety which the libelant or intervener shall be unable to collect or enforce against either vessel shall be paid by the other vessel or stipulators. to the extent of the stipulated value thereof beyond the moiety due from said vessel. The Alabama and The Gamecock, 92 U. S. 695, 23 L. Ed. 763.

2. On October 21, 1905, the libelant paid to the intervener the sum of $2,734.80 for its loss under the policy of marine insurance referred to in the libel, and, in consideration of such payment, it was agreed that the said libelant should become "subrogated in full to all of the rights of the insured (the

intervener) in and about the subject-matter of the insurance * * * and to all of the rights of said insured against the wrongdoer causing said loss, in such proportion as the amount of the insurance in said policy bears proportionately to the insured valuation, in said policy, with full privilege and authority to sue in the name of the insurer, but at the expense of the insurer, but in no event to exceed $3,000."

The libelant is entitled in this action to recover no greater sum, with interest and costs, than is provided for in the agreement just referred to, and the decree will provide that the whole amount of damages recovered in this action shall be divided between the libelant and the intervener in accordance with the terms of such agreement.

Let a decree be entered in favor of the libelant and intervener against the tug Tiger and the steamer Robert Dollar, for damages and costs in accordance with the foregoing opinion. The amount of damages recovered to bear interest from the date of the filing of the libel herein, and the matter will be referred to United States Commissioner Brown, to ascertain and report the damages sustained by the libelant and the intervener.